We understand that all council are present, accordingly we will dispense with the calling of the calendar. We'll proceed to the first case, United States versus 650 Fifth Avenue. Thanks. Thank you. May it please the court, my name is Daniel Razumna, and together with John Gleeson, we represent claimants, Alavi Foundation and 650 Fifth Avenue Company. This is an appeal of a civil forfeiture case in which hundreds of millions of dollars of claimants' properties were forfeited based on alleged services for Iran. Alavi is a 40-year-old New York charity that has given money exclusively to U.S. and Canadian entities. The Fifth Avenue Company is a real estate partnership formed in New York in 1989 to hold an office tower on Fifth Avenue. Despite a previous trip to this court, the district court made many of the same errors as found in the last appeal, and claimants were once again deprived of the right to a fair trial. From the moment the case was remanded to the district court in July of 2016, the district court made rulings based on its deep-seated views of the case and of the claimants, rather than on the law, the evidence, or even this court's mandate. There are four separate issues that we'd like to address today. I will be addressing two issues, and Mr. Gleeson will be addressing two issues. Based on the complexity of the issues, we'd appreciate the court's indulgence that we will keep this as contained as possible. I will be first addressing the statute of limitations and focusing on the fact that the government, particularly the FBI, IRS, and OFAC, were aware of and investigating the very same alleged offenses giving rise to forfeiture more than five years before these forfeiture claims were brought. But Judge Forrest seemed to think that you hadn't really asked for any information about that. Can you tell me, and she seemed to think that in the case, at least on remand, that you'd waived it. Can you speak to that? Sure. There can be no legitimate dispute that claimants, when we sought discovery, and through a series of emails and communications referenced in our brief, we dealt with the assistant U.S. attorneys and negotiated what information of past investigations we would receive. We focused on State Department, IRS, OFAC, and FBI. They agreed to provide those documents to us, and discovery was hindered by the classification process and delays by the government. Over and over it was delayed. We finally moved to compel. We actually filed several motions to compel and opposed protective orders. In those discussions, did you articulate that you wanted these things for statute of limitations purposes, or was that not explicitly said? In those discussions, we did not. There was an agreement to provide that information. What we explained to the court in moving for, and just to note, Judge Shinn, we never tell the other side why we're looking for evidence. We said we need this past investigation. You're asking for things and not explaining why. Not explaining why, nor would we ever say, look, I want to get this for statute of limitations, or I want to impeach your witness with this. We wouldn't say that. No one sought to litigate that it was overbroad or that it was inappropriate, did they? It was conceivably relevant, and we moved to compel. We explained it was exculpatory. Included in the definition of exculpatory, it's statute of limitations related. By the end, we specifically said we need this for statute of limitations before a critical deposition was to be taken. Judge Forrest denied that. It was reversed. And in the last appeal, this issue was specifically discussed. What was the reasoning for denying it? The reason for denying it on remand was that the issue had been weighted. No, the first time around. I mean, why? The issue, the court found that these materials were entitled to law enforcement privilege. And we pointed out that this is a classic sword and stone. She did so without notice to you, and in essence, she intended to do so, which is one of the reasons why we reversed. Exactly. She did it with sua sponte. She did it sua sponte, and this is the classic sword and stone. We sent it back, and I'm a little familiar with the opinion. Yes, you are, Your Honor. And we sent it back, and we specifically referenced the fact that there had been little or no discovery with regard to it. Yes. I don't understand. I mean, so tell me the basis of her waiver conclusion. The basis of her waiver conclusion is specifically that we didn't identify to the government that this discovery was sought for statute of limitations purpose. We didn't entitle it statute of limitations discovery. That was a mistake, Your Honor. There was no basis for that. The instructions from this court were clear. It was remanded with instructions for further proceedings consistent with the opinion. And nonetheless, the government was allowed to take this position where the sword, they said that this previous information about the previous investigations, the facts of these alleged offenses was unknown and unknowable before November 2004. Yet at the same time, when we sought discovery, saying, really, we want to see this, they took this position that it had been waived, that it was not relevant. And I will offer, Your Honors, in the appendix, there is a particular document, A1362 to 1371. And this is a critical document. It's from 1996. And in this document, it talks about the FBI working with OFAC to potentially remove the tax-exempt status of the Alavi Foundation. And then on the third page, there's a reference to ASNY, Alavi Foundation New York. Page after page thereafter, it's redacted. We have no idea what's in there. In this case, even the information that's squeezed through in discovery. Did she look at any of this in camera? We submitted it. It wasn't in camera, Your Honor. We submitted this. And she did not. Oh, I'm sorry. Unredacted version. She did not. She did not. Did you ask her to do that? We asked her for us to receive it, Your Honor. We did not. I don't believe you. You didn't have the unredacted version. We did not. We specifically were denied it. And, Your Honors, this is not something where the simple fact of the failure to provide the discovery merits reversal and revamp for discovery alone. We think that this information that's squeezed through, that we have, demonstrating that the government was investigating control of Alavi by the Iranian mission, Iranian ownership of the building, and money transfers to Iran. We have enough right now that we deserve summary judgment. Summary judgment on statute of limitations. Why? Because the government has conceded that they've pled this case as a continuing conspiracy. And where the alleged offense is a continuing conspiracy, a continuing scheme, the government has to act within five years. They didn't. This was known before November 2004. The government waited too long. We are entitled to summary judgment. It doesn't need to go back. We're entitled to summary judgment on this. And the government's decision to plead this as a continuing scheme was strategic, to the extent they could have pled multiple discrete acts after November 2004. They didn't. They chose to do it this way because they wanted forfeiture going back to 1995. They thought the evidence, what exists, was stronger in 1995. You said you were going to cover two issues. So thank you, Your Honor. Take a couple of minutes on the second issue. The second issue, Your Honor, is the retained theory of forfeiture. The government here was forced to use a theory of forfeiture that property was retained as a result of the criminal acts, alleged criminal acts, because all of the properties, the real properties, were acquired before the Iranian sanctions went into effect. The sanctions went into effect in 1995 with one minor exception. The building and the other properties were all acquired before 1995. In light of that, the government alleged that the properties were retained as a result of these unlawful acts, borrowing from this court's decision, which, as Wesley was on the court that day, on the Torres case. In U.S. v. Torres, it was a situation in which the defendant was accused of fraud in connection with lying about her income to receive rental subsidies. And the court found that the money that would have been paid by her was available to her. She had the money available, but instead of using it, NYCHA went and paid the landlord. So she got to hang on to her own money. She retained her own money. She got to hang on to her money. And that is a situation, unlike the obtained theory of forfeiture, where proceeds are obtained, it's what did happen, what actually happened. In this case, when you get to retained property, one necessarily has to think about what would have happened but for the unlawful conduct. In Torres, as Your Honor found, that was fairly easy. The money was available. She would have had to pay it. It was an exact sum. What about the refinancing, though, and the fact that the building may have been struggling financially because of the tax burden? Doesn't that come into play and doesn't that begin to enter into the retention kind of? Your Honor, I think that's necessarily hypothetical and necessarily speculative. Who knows whether a lobby would have stopped giving charitable donations in those years or maybe sold a greater portion of its interest. In this case, that wasn't done. The jury wasn't informed. They weren't asked, nor could they have been asked, figure out how much of the building would have been lost. Instead, they said the entire building was retained because of a presumed avalanche of lawsuits or a devaluation, but the jury had no basis to evaluate that. And I will tell you, on this avalanche of lawsuits or the two in particular, the jury not only couldn't presume that there would have been lawsuits filed, but who knows whether they would have been successful. There was no basis for the jury to find that this presumed avalanche, hypothetical lawsuits, would have been successful. They weren't instructed on the law. They had no information about the burden of proof, what evidence would have been admissible. The government relied on the two cases, Gabay and Plateau, and I will note, in those two cases, the actions were solely against a lobby foundation, not the partnership. And this court in Kirshenbaum held that a lobby was statutorily disqualified from being an agency or instrumentality under the FSIA. Those claims wouldn't have gone anywhere because a lobby is a New York citizen. It's a corporate citizen. So the court gave an instruction insinuating that there would have been lawsuits and they would have been successful, but that retained theory of forfeiture never should have been presented. Let me just ask one question before you sit down. Let me try to understand your theory. Is there, and this question goes to the provenance of the retained theory. Supreme Court teaching on that, Second Circuit teaching on that. Where does the theory come from? It really comes from the Torres case, Your Honor, which is from this court. Right, other than Torres. There's really not a lot about it. It really is kind of an interpretation of the word obtained and whether one can presume property is obtained. And we're not suggesting in the right circumstance, like Torres, or in a bankruptcy fraud case where someone fails to disclose something and gets away with it, that theory can work. Getting to hang on to something by utilizing something that you're not entitled to. Correct. And with the court's indulgence, I just want to mention one thing. In Torres, the court wrote, and this is a quote, the defendant saved a, quote, discrete sum of money saved exactly corresponding to the reduction she was granted and available for her use as a direct result of her fraud. I can certainly say that was nowhere near what happened here. Now, Mr. Gleason will address two other issues, statute of limitations and the Fifth Amendment issues. Good morning. May it please the Court, as Mr. Rizomno mentioned, I'm going to address the suppression issue and I'm going to address some of the bundle of issues that arose in connection with the Fifth Amendment invocations that were approved at trial. With respect to suppression, the denial of our motion to suppress the fruits of the search of Alavi's offices in December of 2008 has to be reversed again. The good faith finding was wrong. This court, in sending the case back We said the warrant was facially inadequate. Facially inadequate for because it failed to particularize. I don't understand how good faith even is worth talking about. I mean, I know I'm asking questions. I know, Mr. Gleason, that you like that question. I'm going to ask it again in a few minutes. But there was no attempt at all to do what we asked the court to do. We specifically instructed the judge to do inevitable discovery analysis and we laid out the exact case law that requires it. Is it clear to you that it was not done? Yes. It would have been a simple thing to do, would it not? You could have measured. You could have taken a list of every single exhibit that the government wanted to present and we would have had a grid. We would have had a record. But where can I find any way of knowing, other than a bold assertion, that because the discovery requests were so broad and that the discovery from the judgment creditors was so broad, that ultimately all the documents that the government had, they would have discovered it in any event? There's no way to read this record to tell me that. Can you give me one page in this record where I can do that kind of analysis? Well, I'm loathe to interrupt this question, Judge, but obviously that's our view as well. If I can encapsulate. How many documents are we talking about? Was it realistic to go through each document? Well, it was realistic and, Judge, it was required. How many documents? Hundreds. Hundreds. 200 boxes of documents. How does a district judge go through 200 boxes of documents one by one and explain an inevitable discovery? A district judge starts with respect, starts identifying all of the contingencies that would have to be resolved to make the determination that those documents would inevitably have been disclosed but for the legal search, for example. And I'll suggest to this court that the basic problem with the district court's approach to this, and the government shared it, was the assumption that assuming that the amended complaint was filed against the Alavi Foundation, that there would then be civil discovery and, therefore, the documents would have been produced. But, in fact, that's the beginning of the inquiry. After that, assuming, and I'll just say this, I'm not going to dwell on it, on this record the finding that there would have been an amended complaint against Alavi is not supported. But assuming there would have been, then the question is, well, would there have been pre-1989 allegations in that complaint? What would government civil discovery demands have looked like? Government didn't even attempt to present evidence that it would have sought the same discovery. Your position, of course, is that shortcuts or breezy treatment of all of this was foreclosed by the mandate rule. We told her specifically what should be done, did we not? Yes. For each particular piece of evidence, how the discovery would have provided that evidence, that it would have been more likely than not that it would have been inevitably discovered, with a high degree of confidence, and this got such short shrift by the district court, it's just a few pages of the opinion, it just assumed, and let me suggest this by way of contrast, both the district court and the government rely on VLAR, where Judge Sullivan, when he was a district court, engaged in exactly this sort of, the phrase means something, the discovery has to be inevitable. The district court said she could find this with relative ease. It's not supposed to be easy. You roll up your sleeves, identify the contingencies that have to have broken in the government's favor, and decide, for example, in Judge Sullivan's decision, well, suppose they made the identical request. There's still objections and burdensomeness issues and privilege issues. That, it's not easy. Some of you have done it. It's hard work. The determination as to whether in the face of a facially deficient warrant that so obviously violated the Fourth Amendment, whether or not those documents would inevitably, with a high degree of confidence, have been disclosed. And she gave, the district court gave that the back of her hand. Why don't you go to the second issue? Second issue is just a few of the issues arising under the, with respect to the Fifth Amendment assertions. Standing alone, the preclusion of the testimony of Hassani and DeBierin is indefensible in and of itself, requires a new trial in this case. The district judge's job, and this is set forth in this court's decision in 4003 to 4005 Fifth Avenue, the district judge's job is to facilitate testimony in circumstances like this, not to preclude it. Waiver can only be found when there is abusive, tactical use of the assertion of the privilege and then the waiver of the privilege, and that case is a perfect example. Similar case. Discovery here had closed, and that was the basis for her not wanting to do this. She felt that this would reopen Discovery after many years of Discovery.  Is that an abuse of discretion? Is it an abuse of discretion standard? Yes. Excuse me for interruption. Yeah, go ahead. Yes, it is, and the case went back at the very first appearance, Your Honor. The case goes back in November of 2016. Mr. Rizomna, at the first appearance, seven months before the trial, says, by the way, there were some witnesses who three years ago asserted the Fifth, who this time might testify the government may want to depose them. There was not only, and I'm going to once again make note of this court's admonition that district judges are supposed to, in a case like this where the government, it's a civil forfeiture case, the government is the stakeholder, the plaintiff, in a high-stakes civil forfeiture case, also holds this power to threaten criminal prosecution. It's a very sensitive situation, and this court has recognized in the past that in circumstances like that, district courts need to work to facilitate the waiver if they can. Seven months before trial, the district court is informed that some of our witnesses might waive and testify, and her first reaction, the first words out of her mouth was, well, the government might say that it's too late. Seven months later, after unsuccessful efforts with respect to two of our board members, the government eventually said it was too late, and the district court agreed, but it's exactly the opposite of what the district court is instructed by this court's case law to do. The kind of abuse, Judge Kinn, the kind of abuse that supports the ruling that we got here is evidenced in that 4003 to 4005 case, where in a civil forfeiture case, where the principal asserts the victim. At trial, the government was permitted to play the videos and read some questions. Were your clients given the opportunity to explain that the witnesses had changed their minds? Did the jury find that out? No. No, we were precluded. So much happened in this trial where the government was able to rely on its evidence. We were not permitted to answer it. Did you make an offer of proof that you wanted to bring out that these witnesses changed their minds? In other words, to try to mitigate the effect. We tried to demonstrate the short answer to your question is, other than to tell the court that they should be permitted to testify and to have them precluded, the rest of our response was we wanted to elicit evidence with regard to agent conduct, with regard to prosecutor conduct, that would explain to the jury, since the adverse inference is permissible, and we are entitled to put on evidence that supports a contrary inference, we wanted to show the jury why they asserted the fifth. And it was not because their testimony would be adverse to their own criminal interest or a lobbyist. It was because of the way they were treated by the FBI and the way they were treated by the prosecutors. That was precluded. Like so much of the government's case, it went unanswered by us because the district court precluded our evidence. If you win on these two issues, what are you looking for? On these two, well, we're looking for, this time around, we think this court ought to issue an order suppressing the evidence. If we get this far, we think this court ought to enter an order directing judgment for the claimants based on statute of limitations grounds, but specifically on this issue, we would like an order that reverses on the ground that these individuals should have been able to testify, and because of the government misconduct precludes any use of prior assertions of the fifth on remand. We think this is, when you look, the government seeks to divide and conquer all the, and I know this is well briefed, so I'm not going to spend all the time on the facts. Government seeks to divide and conquer them. This is an effort by the government to use that subpoena power not to get testimony. The ones who wanted to testify were said, don't bother. Don't bother coming in. The ones who said they were going to assert the fifth came in for like a Cecil B. DeMille-type production, 70 questions asked on video, all of them the prosecutor knew ahead of time the Fifth Amendment would be asserted with respect to, and I suggest to this Court it's very difficult to convey to you the prejudicial effect of the way every three days during that trial, those video recordings. The other thing, Judge Parker, to answer your question is if there are any assertions of the fifth on remand, it should be through stipulation. But the government is entirely, step back, the implication goes question by question. What were they supposed to do? The district court in these circumstances, with respect, should have under old chief and other similar precedents, should have accepted our stipulation that with respect to all questions related to the Alavi Foundation and its relationship to Asa and Bank Mellie, that witness would have asserted the Fifth Amendment privilege, period. That's all that was necessary. The way this was set up, we've cited to you the dissent in the Brinks case. You know, when a prosecutor knows ahead of time there's going to be a Fifth Amendment asserted to every question and then has the opportunity to present the video recorded Fifth and then ask cherry-picked questions, it inescapably creates the inference that the witness's answer to that particular question would have been adverse to Alavi. That's how they proved their case. Those witnesses would have testified that they had no idea who Shakiri and Agamiri, the persons to whom Bank Mellie said that it had sold Asa, they didn't know who they were. They tried for years to find out who they were. The juxtaposition of the assertion of the Fifth and the ability to read those cherry-picked questions allowed the jury to infer that particular questions would have been answered in a particular way. It wasn't. In the end of the day, you know, we know nobody's entitled to a perfect trial. This was not a fair trial. All right. Let's hear from the government. May it please the Court, Assistant United States Attorney Michael Lockhart for the government. I will be guided in the order of the issues by the panel. Otherwise, I would start at the back and work my way back towards the front. So I would like to start with the Fifth Amendment issues that counsel raised. And I think here it's important that our principal argument is going to be that the record answers all of these arguments. That's going to be true with respect to this issue as well as respect to the additional issues that I'm about to address. That's the case in every case. But I'd like to explain. In every case, the record answers. That's why we have a record. Absolutely correct, Your Honor. And I'd like to talk about that record right now. I am troubled by the refusal to let them walk back their invocations of the Fifth when there were seven months to go, plenty of time. I know there's a lot of pressure. Easy for me to say plenty of time. But there were seven months to conduct some depositions, and that part troubles me. I think what that argument by the claimants does, Your Honor, is I think it reverses the burden that 4003 to 4005 sets out for how to address these issues. And what this Court said in that case is that untimely motion by the claimant. So what's happening here is untimely if it's seven months before and what prejudice is there to the government by unfair prejudice we're talking about. Obviously, you don't want them to testify. But what unfair prejudice is there when you've got time to take depositions? So I wouldn't say that we didn't want them to testify. I would say we didn't want to reopen discovery. That's what I would say. But what 4003 to 4005? You wanted them to testify, but you were only doing it because you didn't want to reopen discovery? I don't know if that makes any sense. Well, let me go again through the chronology that I think explains this. What prejudice was there to the government by not agreeing to this and taking their depositions so that you would know what they would have to say? So I think the chronology sort of sheds some light on what the time period looks like. I don't think the time period looks like seven months before trial. This issue was teed up. I don't think that's what the record shows. I think what the record shows is there was a general observation at a conference that some people who previously had invoked might be willing to testify. But there's no identification. What did you say in response to that? Who were they? Did you ask who they were? I think our response is a lobby is following up on that and they'll let us know if and when this becomes a real issue. What was your response when that offer was made? I don't recall if we – I honestly don't recall if we responded. So then you knew seven months before that the continuing invocation of statute of limitations was in play? Potentially, that it was potentially in play. And then we were advised by a claimant's counsel about two and a half months before trial about two particular witnesses that they intended to offer. And at that point, we didn't do nothing. We contacted the witness's counsel to find out is this in fact true, first of all, and what would their position be on a deposition if we sought to depose them in advance of trial. But what never happened was a lobby never went to the court to ask for relief from the discovery deadlines, which I think when you look at 4003 to 4005, the process that's laid out there kind of maps onto this. And again, in 4003 to 4005, that wasn't even a trial. That was on a motion for summary judgment. And this court found that the district court had discretion in light of the course of discovery and its evaluation of potential prejudice to deny the un-invoking. Here, a lobby didn't actually ask for any relief and didn't propose any accommodations until shortly before trial. So I think it's a real burden shifting to put it on the court and the government, who's not the proponent of these witnesses, to say you guys have to protect our rights, you have to invoke our procedures under 4003, 4005 Fifth Avenue. And I think it was perfectly within the court's discretion to conclude that with these depositions having been taken in 2013, almost four years ago at this point, with discovery having been closed and the parties being directed to be in the same posture for trial that they had been prior to the remand, to say that it would be prejudicial. And I think it would be prejudicial because depositions are intended not only to find out what they would testify to, but also to discover additional information, to lead to potential impeachment information. Why didn't the government agree to stipulate that these witnesses would take offense? You know, I spent a number of years as a southern district trial judge. That's how we always did it. We decided not to do that because of the claimant's argument that the invocations were coerced. And for that reason, we thought that playing short videos so that the jury could assess the demeanor of the witnesses when they were asked the questions would be relevant to the jury's determination. I don't understand what looking at a, I mean, that's an argument, but in the real world, I don't understand what looking at a witness invoking the Fifth Amendment is going to teach a jury. I think it is. That seems, okay, I'm sorry, I didn't mean to. Sure, Your Honor, and I apologize. Sorry for cutting you off. I think it is relevant in light of the nature of the argument by claimants on this point, sort of the full-throatedness of the attack on the way that interviews were conducted. I mean, along those lines, I mean, witnesses are always, in a certain sense, coerced to take the Fifth because there's the government on the other side, and the witness is concerned that the government will come after them. That's present in every invocation case. The question isn't whether the privilege was invoked because the witness perceived some jeopardy and had the right to invoke. The question is whether they were bullied into invoking, notwithstanding the fact that they wanted to offer exculpatory testimony. That's the claimant's argument. How is a statement from the witness, I respectfully decline to answer that question on the ground and may tend to incriminate me, what is that going to possibly teach a jury? A couple of things, Your Honor. I think first, that question is a weight question. What? I think that is a weight of the evidence question rather than an admissibility of the evidence question. But I also think that, you know, a lot of these arguments was that these people were so frightened by their interviews, you know, jackbooted, heavy-fisted interview techniques by the FBI, that two or three or four years later they were still so frightened that they would invoke the fifth. I mean, everybody who feels themselves in the gun sights of exceptionally intelligent, exceptionally experienced U.S. attorneys is going to be nervous. My colleagues appreciate the compliment. I'm nervous now. It's a different kind of, a lot of these are going to be different kinds of nervousness, Your Honor. When you do the balancing, the 403 balancing, I mean, whatever probative value there is, I think what Judge Parker is suggesting is that it's light, if any, but the danger of unfair prejudice is great, particularly given the way it was packaged and the way it was played out, you know, every couple of days and with the totality of things and the instructions on inferences. It does seem inconsistent with our case law that says the district court should do what it can to get the evidence in. So just a couple of observations. I think we attempted to make the presentation of the evidence as short and efficient as possible. As what? Short and efficient as possible. If you did that, you'd use the stipulation. Sure. But in playing the depositions, they were short. They're a few minutes each. You didn't spread them out for dramatic effect. Is that what you're telling us? They were spread out for storytelling effect, so that when ‑‑ For dramatic effect. Storytelling effect is dramatic effect. Well, also relevance effect. Also relevance effect, so that if there's, you know, a person, like a particular ‑‑ I guess we could have. We're trying to dramatize the invocation of the Fifth. We were trying to present these invocations in a way that we thought was appropriate in light of the arguments. Maybe you should move on to ‑‑ Sorry, Your Honor. But let me just talk a little bit about the argument, because I do think it's important for us. These men had an absolute constitutional right to invoke the Fifth Amendment. Yes. I agree that they had a valid Fifth Amendment. And would you dispute the fact that the procedures you used burdened that right? No, I don't agree that it did. And certainly not impermissibly under sort of the balancing that has to go on, and has gone on in many cases. Tell me about inevitable discovery. Is that a point that you were ‑‑ I was hoping to, Your Honor. So let me talk about inevitable discovery. Why don't you start with how did the district judge comply with our direction that she comply with Ang 1 and Ang 2? Did she make any attempt to comply with Ang 1 and Ang 2? I think so, Your Honor. I think the district court did follow the court's instructions. Did we not say that she should make a particular ‑‑ that she identify each and every document and trace each and every document as to how it would eventually have been discovered? Could you point me by specific references right this minute to the pages where she did exactly what we told her to do in terms of identifying each and every document that was discovered and how they would have been discovered? If I could, I would point you to where that happens, and then I'll explain why it does that. So I would point you to Government's Exhibit 70 from the suppression hearing, which is the stipulation that identifies and introduces as exhibits into the record of the suppression hearing the documents that a lobby in fact actually produced in response to discovery requests after they were made. And then her identification of each and every one of those and how those were ‑‑ but she didn't go through them. Well, this is how I think Valar ‑‑ a lobbyist counsel was correct to anticipate that we would turn to Valar because I think this is Valar, and it is Valar in the sense that we were not arguing that all of the search materials should not be suppressed. We were only arguing that the actually produced search materials should not be suppressed. So Government's Exhibit 70 by definition includes all of the documents that were obtained inevitably as a result of the discovery request. How am I supposed to ‑‑ so I'm supposed to go into the appendix without reference by her to the record as to the documents and seek them out and do the analysis myself, is that it? My clerk and I, we should sort through the 30,000 pages that constitute the record of this. Is that what the individualized practice is? I don't think you have to because they're on the disk. And just like in Valar where a subpoena was issued and there was actually litigation about the scope of that subpoena and then actually documents were produced in response, those documents, whatever is in there, those are by definition the documents that inevitably would have been discovered. I think it's all quite beside the point because what you did when you went back before the district judge was controlled and framed by the mandate rule. We didn't tell you to go back, this court didn't tell you to go back and do a little more balancing or figure out what an easier approach to this problem was. This problem, by the way, was the government's own creation because of the breadth of the search warrant and the way it was executed. But what you were supposed to do was framed by the mandate rule. And as I read the record, the district court judge, with your cooperation, simply did not obey the mandate. You didn't have any, there was no flex, there was no wiggle room, no discretion when you get a mandate from this court. You're expected to follow it. You're expected to do what the court tells you. Otherwise, the system breaks down, counsel. I agree with everything Your Honor said, except that I think that the district court's proceedings did comply with the mandate rule. The district court held, as the court directed, an extensive evidentiary proceeding, lasting over four days. You directed her to make findings, and as Judge Wesley indicated to you, the findings are nowhere in the record. She didn't make them. She did make particularized findings about Not with respect to you, no. No, not with respect to you. With all due respect, she did not, and you know that. So don't say that she did. And we haven't argued that she did. Oh, don't, you know, look, she didn't do what we told her to do. It would have been easy. Well, it would not have been easy, but it was required. So don't stand there and tell me that she complied with what we told her to do, because we were quite specific with what we told her to do. And so let me ask you this. Yes, Your Honor. Could this matter be remanded so that the appropriate analysis could be done and then returned to this panel to determine whether any of those matters, any of that evidence should be suppressed under a Jacobson remand? If the court concludes that the district court applied the correct legal analysis, it could remand to the district court to reevaluate under the correct legal analysis. Yes. Thank you. Why don't you move on to the next issue? Yes, Your Honor. I would, before we move away from suppression, I would just quickly offer that while the court did find that the warrant was facially inadequate, the panel also noted that the government had argued with some force that the good faith exception might apply under these circumstances, and the remand was also to address the factual and legal issues surrounding the good faith exception, which this court has done before, for example, in Romaine and in Rosa, in identifying good faith in connection with executing a facially invalid warrant. The good faith exception being that they said that the NS affidavit was attached. It was not. It was facially, it failed facially to particularize in any way, shape, or form, and so we should say that a two-page search warrant that makes reference to what was a very detailed affidavit by a very knowledgeable, and which did supply probable cause, you might add. The panel made that finding. The panel was unanimous in that regard, but two members of the panel did make that finding. But a two-page search warrant covering any and all documents with no time limitation whatsoever, which this panel said, or which a prior panel said, failed to particularize in any way, shape, or form that that's entitled to good faith. If that's entitled to good faith, then I suspect any warrant is. None. Because it was prepared by a member of the U.S. Attorney's Office who was a graduate of the University of Virginia, and spent two or three paragraphs telling us about what a great law school she'd gone to, and so therefore that she was knowledgeable, but failed to attach the NS affidavit, and it was done in a hurry, even though the NS affidavit had been prepared in advance of the issuance of the search warrant. As a graduate of UVA law, I am not offering a blanket rule. I've hired many UVA graduates, and they've been terrific clerks, some of them U.S. attorneys. We're not offering a blanket law rule. I'm trying to understand the good faith analysis as to the pedigree of the law school as an appropriate factor with regard to good faith. And the only point I was trying to make, Your Honor, is that even in ROSA, for example, which authorized the search for any and all evidence of crime contained on electronics, which I would argue is broader than the categories of documents that are identified in this search warrant, but I would just say the fact that it's facially deficient doesn't inherently preclude the finding of good faith. That's the argument I wanted to make. Let me ask you this. Before the proceedings concluded in the district court, Yes, Your Honor. did the government ever take the position that the district court's handling of the inevitable discovery component of our mandate was adequate? We did. We thought that it was. You told her below that you thought that what she did complied with the mandate. And that is why we offered stipulation GX70, is because our judgment was. You believed and you told the government, excuse me, you told the district court that in the government's view, what she did complied with the mandate. You told her in words or in substance. We believed that by identifying the documents actually produced in response to the discovery request, that that satisfied the connecting of the dots. Satisfied is what was instructed to happen in the mandate. Yes, Your Honor. You told the court that it had done what it was required to do by this court. I can't recall exactly, but I'm certain that we agreed that the record was sufficient for the court to make its findings. Was there some way to line up? I mean, if there were some way in the record to figure it out, it would be a lot easier. I mean, the thing that troubles me is we even emphasized it. The court must, must, and then we italicized the following language. For each particular piece of evidence, specifically analyze and explain, if at all, discovery of that piece of evidence would have been more likely than not, inevitable, absent the unlawful search. That's a quote from Aang 1, our law. So, you know, and so I get this record and you tell me there's this disk, and because on the disk is all these documents that somehow they match up to what you see in the search warrant, I should be satisfied with that and it's satisfied Judge Forrest. I'm not. I'm not. That's not what I told, what we, what three of us told Judge Forrest to do remotely. Now, let me ask you this. Yes, Your Honor. Was your proof to her, did you make a representation to her that the doc, that what you had on that disk matched up with what you seized under the search warrant? The stipulation provided that those disks comprised the Illawarra Foundation's discovery of production and that production included the documents from the search that we were proposing. All of the documents from the search? Not all of the documents from the search, only those documents from the search that we were opposing preclusion. Okay. And were you precluded from using any of the documents that were not covered by that stipulation? Not on suppression grounds. Not on suppression grounds. So I can't represent them. Did you make a representation to the court that you were not going to use them? We made, oh, I'm sorry, I misunderstood the court's question. We did not propose to use any records from the search that were not produced in discovery. We did not offer those. We did not propose them as exhibits. All right. Just a couple more with the signatures. Did your opponents object to the characterization of the documents that were on the disk and it's in comparison to the documents that you had seized and intended to use from the seizure? So the parties stipulated to the nature of the contents of the disk? I don't think that a lobby stipulated to their admissibility at trial, but they did stipulate to the contents of the disk, and I can understand why. And can you give me the page again of that stipulation? So that is the suppression exhibit 70, which I don't have the Joint Appendix site, but I will get it for your honor. Thank you. Why don't you move on to statute of limitations? So for statute of limitations, I want to talk first about the mandate argument, because I do think that is an important argument and one the court obviously and rightly is interested in.  What the prior panel decision did is it included the holding that the district court had procedurally erred in supersponding, considering, and rejecting the statute of limitations defense. And the court quite helpfully actually provided a checklist for the parties to refer to in the concluding section of that opinion. What the opinion did not do is identify a particular discovery ruling that was an error, or really identify any particular discovery ruling. Well, it characterized it, and I think that's a fair assessment. I've been giving you a really hard time, but I'll give you this one. It characterized that there had been minimal discovery to date, but it didn't evaluate the respective positions of the parties in terms of what had been asked for or that wasn't litigated or argued extensively in front of the court. Because the issue really was the suespante granting, and the government backed away from trying to defend that very quickly at the first argument. I may or may not recall that, Your Honor. You may recall that. And so I get that, but let me ask you this. On that, well, go ahead and finish what you want to say about the record, because I want to ask you about your alternate theory with regard to continuing claims. Yes, Your Honor. So then just very quickly, what the opinion did, and how I think the opinion was implemented below, is to identify discovery certainly as an issue that a non-moving party is entitled to raise in opposing summary judgment, and one of the reasons why the court couldn't conclude that there was no prejudice from the suespante nature of the summary judgment order. And under Rule 56D, I think, lays out the non-movement's right to identify potential discovery issues in opposing summary judgment. So on remand, we did address the issue of whether there were discovery issues that precluded summary judgment at that point in time, and this is where I think we really get into the district court's discretion in controlling the course of discovery, because this discovery was, I think claimants would agree, a complex affair with a lot of issues, a lot of arguments, and a lot of motions. Did your opponents win any of them? Yes. Yes, they did. We had—I'm 100% certain of that, Your Honor. So— Less than a dozen, right? I couldn't count. I couldn't count. So in the course of that discovery, which I think the district court cataloged pretty exhaustively in its review, in its order denying the reopening of discovery, I think there are a couple things that are clear about that. I think it is clear that the statute of limitations as a theory of relevance was not raised until the very end of the discovery period, and at that point only with respect— How do you respond to counsel's point that they don't need to tell you why they want the stuff, they just need to tell you what they want? My response is that they don't have to, but on numerous occasions they did, and the record is replete with letters from claimants' counsel raising to the court reasons why discovery that the claimants sought was necessary or relevant to their claims, and they never argued statute of limitations and never gave the district court a basis to conclude. Would that change the result if they put in the word statute of limitations? The district court would then have been able to analyze the issues with statute of limitations as a relevant factor. Was there any point after you joined the prosecution team in this case that you believed that statute of limitations was not on the table? What I believe is that certainly it was pleaded as an affirmative defense, but in the course of a long discovery proceeding and a lot of conversations, statute of limitations wasn't raised. A whole bunch of other stuff was. Isn't it apparent that it was a real issue in the case? It was pled, but it's not. Isn't it apparent to you that it was a real issue in this case? What was apparent to me is that there were several real issues in the case that were being heavily discussed and litigated. Is it your position that statute of limitations was not in that group? It was certainly not one of the ones being actively discussed and litigated. But in this case, statute of limitations is all over it because you're going back to the 90s. So I think there are a couple of issues. Certainly statute of limitations is an issue. But there are a number of other issues as well. No question about it.  We're talking about statute of limitations. And by that, I don't just mean theories of relevance. I also mean things like privilege issues, burdensomeness issues. There's a lot of... This was a complex case. Yes. No doubt about it. Yes. And so my only point is that... My suggestion is we had motions to compel and to quash that were briefed where statute of limitations was never raised, where the court issued rulings, and only after those decisions were issued, in the very last minute, did the lobby raise statute of limitations in a very limited way. And I think within the confines of the district court's discretion. Would you have been more responsive if they had explicitly mentioned statute of limitations? I don't really... We would have had to assess it in that light. Absolutely, Your Honor. Let's move on to your alternative theory on statute of limitations. Yes. So... I want to... Before... By alternative theory... You're trying to get it both ways. You want relief from 1995 on, but you're arguing that something that happened after 2004 is what's critical. So let me... If I may, I can do this afterwards or beforehand. I do want to make a point about how the discovery rule works and how claims accrue, that I think it's not relevant for summary judgment purposes if it's not resolved by summary judgment. But on the summary judgment record, I think it is relevant for determining that the district court correctly granted summary judgment. And the point that I want to make is the nexus in the case law when it comes to the discovery rule between being on notice of the facts and being able to conduct a reasonable investigation. Those two things are not divorced. I think a lot of you have made arguments that would divorce those two things so that once suspicions are raised, whether or not there is a means to investigate those suspicions, the clock starts to run. And I think that's not true under cases like Kubrick and McIntyre and Cronish. And what I think the record shows is that the investigation that was done, I don't think there's a genuine issue of material fact that that investigation could have been done sooner. And I think it's also important for the discovery rule that the way the cases apply it is that the investigation is measured against what can be learned from people besides the wrongdoers. Were your 20 minutes over? Yes, Your Honor. The first case? Yes, Your Honor. How can we really make an assessment of the statute of limitations on the basis of this record? We didn't produce any documents. The documents were heavily redacted. And there are powerful clues in this record that the government was actively targeting well back into the 90s. I mean, one of the newspaper articles, for example, referenced FBI secret documents. There are all kinds of things in the record that suggest active specific government scrutiny of these people going back. And how are we to intelligently assess that on the basis of what you produce? Yes, Your Honor. And since Your Honor mentioned redactions and it came up also in Clayman's argument, I do just want to quickly clarify the record on redactions. But I can do that after. You have about two more minutes to cover whatever else you want because we still have four other cases. Yes, Your Honor. The district court did review an unredacted copy of all the discovery in order to determine that the law enforcement privilege applied. And that is part of the classified record or the ex parte record. So just two quick things about the record Your Honor pointed out, which is that that record also includes, number one, sustained denials by a lobby and by the government of Iran, which I think is relevant if you look at McIntyre, when the wrongdoer is denying the conduct. And number two, it illustrates that those investigations came to nothing. The IRS and EOFAC came up with nothing as a result of that, just like the Gabbay plaintiffs did, just like the Flatow plaintiffs did. Thank you. Okay. So in my final 60 seconds or so, I do just want to briefly touch on the retained properties issue that the Claimant's Counsel raised. And here, I'm not sure what the — I understand trying to distinguish this from Torres, where there's sort of a dollar-for-dollar ability to correlate these things. But I think in the light of the forfeiture law, which the purpose is to divest wrongdoers of wrongfully obtained property, whether or not there is a single-dollar-for-single-dollar correlation is not the question. This isn't designed to create a windfall so that you can commit a crime, retain property that you would not have retained without committing the crime, and then pay back some of it but keep some of it, right? That's not the purpose of the forfeiture laws. That's not what proceeds means. Proceeds means any property obtained or retained as a result of the commission of the offense. And in light of the timing issues, I'm happy to address any questions the Court has. Is it your view that the proof, in essence, is that to some degree this is money laundering and or that the profitability of the enterprise somehow enriched Iran, and provision of services to Iran, that somehow the property itself becomes the device of the crime itself? So there are two — that's an excellent question for two reasons. There are two independent bases for forfeiture. One is as property obtained or retained, the proceeds theory, because of the offense. The other is property involved in money laundering. And the property involved in money laundering finding is not affected, frankly, by any of the other issues we've been talking about, including statute of limitations. And if that finding is affirmed and the proportionality finding is affirmed, then the arguments about proceeds with respect to the partnership and the building fall away. There still could be an issue with respect to some of the arguments that Lottie has raised about the other properties. But for the two properties, the money laundering finding is enough to sustain the verdict and the judgment. If I engage in money laundering in 1985, and I take the proceeds and I buy a house — Yes, Your Honor. — and I do nothing else, when does the statute of limitations run on that under the retained theory? So the statute of limitations isn't tied to how long the property has been owned. It's really just tied to when the offense occurs or when the offense is discovered. So if there's one single money laundering transaction in 1985, five years after the statute accrues, it's over.  Yes, Your Honor. Rebuttal? I'm going to hold you to your one minute. Okay, Your Honor. Thank you. Just on that, I'm going to go very quickly. On the last point, in terms of the retained theory, complete speculation. There's no — it's not dollar for dollar. The jury was given no basis to infer what would have been saved. Your Honor asked about the involved property. Involved property, money laundering forfeiture, depends on there being proceeds. If the proceeds here were explained that these properties were retained, that's the first step in a money laundering forfeiture theory. That doesn't work either. In terms of the statute of limitations, this issue was before the Court. We addressed it. We briefed it. We put in the Court's order in the appendix. This was alleged as a continuing offense. The Court gave what we like to say the cake and allowed the government to eat it too. Forfeiture was allowed going back to 1995, even though the government's alternate theory is they relied on events after that date. The government relied multiple times on the record, the record, the record with what was before the Court here in terms of statute of limitations. The reality is the government used its lack of knowledge as a sword and prevented us from getting the discovery that we should have gotten. You can't rely on the record because the record was concealed. It was said by Mr. Lockhart, I think inadvertently, that the district court reviewed all of the materials that were redacted. That's not true. It's absolutely not true. Thousands and thousands of pages were done. She reviewed a small sampling, and she thought it was okay to enforce the law enforcement privilege. A small sampling is not enough, particularly if you look at the particular document that I addressed you to. Wait a second. I wasn't going to interrupt you, but I'm going to violate my own rule. I can do that. The stipulation about the documents that were disclosed by you on the disclosure that lined up with the documents that were discovered or that were produced in response to the search warrant, are you saying that that's not the way to understand it? I am saying that, Your Honor. It's a fundamental misconception. Why? Yes. Because Your Honor sent this back for an inevitable discovery analysis, and the government relied on the fact that they alleged that they would have filed this forfeiture claim, would have served the same discovery, and we would have produced the same thing. Those are three findings the district court did not make, didn't even try to make. So the stipulation— You said that the complaint was amended based upon things that they had— That's exactly right. And the discovery was done over two years after the government had been reviewing our unlawfully seized evidence. What about the argument that they only relied on documents that were actually produced in discovery? They were not relying on any other documents that were seized that were not eventually produced in discovery? So the complaint and the discovery requests were based on the unlawful search. This is a classic fruit of the poisonous tree. They can't unlawfully seize our evidence, review it, and then ask specifically in discovery, give us this material, and then say you produced it so it's good. They amended their complaint. We said that in the decision. We said that they amended their complaint based upon—with regard to pre-'98 conduct, based upon what they discovered from their search warrant. But did they then prove or did they then trace what they used as a basis to amend their complaint to show that you had disclosed that in discovery? No, no, not at all. Not at all. There was absolutely none of that. So the complaint was based, as Your Honor found in the last panel, on the unlawfully seized evidence. The discovery came after that. I think the last panel also mentioned that the discovery was based on the unlawful search. One can't say because you produced this material. It's just like a subpoena. But it's inevitable. Discovery is not necessary. Suppress now. Suppress, of course. And then, you know, I want to just address— No, no, no. Enough. Enough. Thank you, Your Honor. I want to hear from your colleague. I was actually going to do—I was just doing both, Your Honor. Oh. Oh, oh, oh, oh. You were— I didn't do a suppression. That's one minute. Yeah. I was going to give you a minute. Yeah. I thought you were taking another minute. I'm going to do something that's going to serve two purposes. One is to—and I'm to orient the Court with respect to the Fifth Amendment assertions. My adversary mentioned that the De Beeren and Hassani were not specifically identified as people who would waive the Fifth and testify at trial and were available for depositions. That happened on March 7th, almost three months before trial. And here's what I want to correct. The government did not write to their counsel and say, as Mr. Lockhart said, is it in fact true you're going to testify? That's not what they wrote. And I mention this not just to correct that statement, but this is at the heart of our claim of government abuse because what the government did instead of take the deposition is write a letter the likes of which I'll bet none of you have ever seen before. They wrote a letter saying, the government writes to inform you of its position with respect to the statute of limitations. It's the government's position that the statute of limitations for bank fraud, which was never mentioned before, this is eight years later after they decided not to prosecute anyone. The statute of limitations for bank fraud and bank fraud conspiracy has not yet run. And the letter goes on to say, we wish to be sure that your clients make fully informed, knowing decisions regarding their possible testimony. They didn't wish to be sure of anything except that those witnesses would once again take the Fifth. That's all that was going on. Thank you. Thank you. We'll reserve the session.